UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
HONG LIU,

                     Plaintiff,

     -against-

QUEENS LIBRARY FOUNDATION, INC.,

                     Defendant.
--------------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 14-7311

**APPEARANCES:**

**For Plaintiff:**
**Jonathan A. Tand & Associates**
990 Stewart Ave. Suite 130
Garden City, New York 11530
By:    Jonathan A. Tand, Esq.
        Gary R. Novins, Esq.

**For Defendant:**
**Lydeckar Diaz, LLC**
200 Broadhollow Road
Melville, NY 11747
      and
101 Hudson Street, Suite 2100
Jersey City, New Jersey 07302
By:    Robert J. Pariser, Esq.
        Kevin D. Clinton, Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Hong Liu ("Plaintiff" or "Liu") commenced this action against Queens Borough Public Library, incorrectly sued herein as Queens Library Foundation, Inc., ("Defendant" or "the Library") asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); New York Executive Law § 296, *et seq.*("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §8-017 ("NYCHRL"); and New York Labor Law ("NYLL") § 194. Presently before the Court is

Defendant's motion for summary judgment. For the reasons the forth below, the motion is granted.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and are undisputed unless otherwise noted.

Plaintiff is a 60 year old female born in China. She has a master's degree in English Literature from the Hunan Teachers University and a master's degree in Library Information Sciences from the University of West Ontario. (Pl.'s 56.1 Resp. ¶¶ 2-5.)

## I.    Overview of Plaintiff's Employment at Queens Library

Liu began her employment at the Library in 1996 as a general assistant. From January 1998 to September 2001, she held the position of assistant branch manager, serving in that position at four branch locations.[1]  As an assistant branch manager, Plaintiff (1) served as a member of the Adult Advisory Committee to develop training sessions for new librarians, (2) supervised,  trained  and evaluated the performance of librarians and clerks, , (3) maintained staff schedules, and (4) managed and resolved staff and patron conflicts. In September 2001, she became branch manager of the Library's Briarwood branch. As manager, Liu was responsible for the overall operation of the Briarwood branch, supervised and managed its staff, and was responsible for its budgeting and staff training. In June 2002, she became a Departmental Assistant for the Extension Service Department ("ESD") at the central library building. Since then the ESD has been renamed the Community Library Services Department ("CLS") and

---

[1] To be clear, Plaintiff was assigned as assistant manager to only one branch at a time. (Def.'s Counter 56.1 ¶145.)

Plaintiff is currently the only departmental assistant for CLS. Prior to approximately 2011, she was supervised by Dale McNeil, then a Director of Library Services. From approximately 2011-2012 she was supervised by Tom Fortin, then a Director of CLS. Since 2012, she has been supervised by Nicholas Buron, the Vice President of Public Service and Strategic Planning. (Pl.'s 56.1 Resp. ¶¶ 6-13; Ex. 2 to Novins Declar.; Ex. A to Pariser Reply Declar.; Def.'s Counter 56.1 ¶ 146, 148.)

As a Departmental Assistant, Liu does not supervise any employees; no employees directly report to her and her position is not considered to be at the executive or managerial level. As the sole CLS Departmental Assistant, Plaintiff is primarily responsible for responding to customer complaints, a task that comprises ninety percent of her duties. Since 2002 when she became a Departmental Assistant she has not completed a performance review for another employee and has not been vested with the authority to issue written warnings to employees. Whereas each Community Library Director is responsible for of overseeing the branch managers and their staff for twenty community libraries, Plaintiff does not have that responsibility. (Pl.'s 56.1 Resp. ¶¶ 14-21.)

At some point in her employment with the Library, Plaintiff "composed a 'branch training report' that included the entire staff of Defendant and which analyzed the conditions of Defendant's training programs and the possible initiatives Defendant, as an organization, could implement to foster the development of future training." (Def.'s Counter 56.1 ¶ 153.)

## II.     Liu's Employment Prior to Her Library Employment

From 1988 to 1993, Plaintiff worked as an Assistant Professor in the Foreign Language Department of Hunan Agricultural University in Changsha, China. As an Assistant Professor, she

was responsible in relevant part to teach English as a second language to undergraduate students by planning and delivering seminars, served as a team leader for other teachers, and assisted teachers in their own curriculum development and material selection. (Def.'s Counter 56.1 ¶¶ 150-151.)

### III. The 2007 Assistant Director of CLS Position

In April 2007, the Library posted three openings for the position of Assistant Director of CLS. The vacancy announcement set forth the following qualifications for the position:

> Minimum of six years of public library experience [;] at least five years in library management. Experience in large library system, consortium or state library preferred. Demonstrated experience in collection development. Ability to communicate effectively, both written and orally. Exceptional interpersonal skills and creative problem solving ability. The ability to lead by example, inspire staff and promote enthusiastic teamwork. An MLS from an ALA-accredited library school, and eligibility for NYS certification. Must have a valid driver's license.

(Pl.'s 56.1 Resp. ¶¶ 25-28; Def.'s Counter 56.1 ¶ 142.)

Liu was interviewed for the position but did not receive it; the three positions went to Nicolas Buron, Manuel Figueroa and Tom Fortin. (Pl.'s 56.1 Resp. ¶¶ 29-30.)

At the time he was interviewed, Buron had been responsible for planning and implementing youth services throughout all 62 of the Library's branches. This responsibility included managing the budgets for the youth services program at all 62 branches. (Pl.'s 56.1 Resp. ¶¶ 31-32.) According to Defendant, "Plaintiff did not have similar budgetary experience at the time of this interview, nor did she have experience in overseeing and implementing organization wide programs." (Def.'s 56.1 Statement ¶ 33.) Plaintiff asserts she "possessed at least five (5) years of management experience with Defendant as both an Assistant Branch

Manager and a Community Library Manager, which allowed her budgetary [experience] and experience in overseeing and implementing organization-wise programs." (Pl.'s 56.1 Resp. ¶ 33.)

At the time of his interview Figueroa was working for the New York Public Library in essentially the same job that the Library had posted. He had 13 years experience as a librarian with 5 years as Supervising Branch Librarian and 2 years as District Librarian. As District Librarian, Mr. Figueroa supervised 12 library branches, reviewed the performance of the managers of those branches, made budget decisions and disciplined all employees in those branches. Plaintiff had never been responsible for managing multiple branch locations at the same time and did not have the budgetary responsibilities that Figueroa had. Nor had she been responsible for hiring, firing, or disciplining employees. (Pl.'s 56.1 Resp. ¶¶ 36-39.)

Fortin had held a leadership position at the San Francisco Public Library similar to the position posted by the Library. He had managerial responsibility for multiple branch locations. His resume documented twenty years experience as a librarian, including serving as Interim Deputy Director for Fargo Public Library (where he supervised more than 40 employees) and as North District Manager for the San Francisco Public Library (overseeing 8 branches). Plaintiff has never been responsible for supervising multiple branch libraries nor for supervising any managerial employees. (Pl.'s 56.1 Resp. ¶¶ 40-42.)

Mr. McNeil, a member of the hiring panel, reported that the panel concluded that Messrs. Buron, Fortin and Figueroa had each established that they possessed significant system-wide managerial and budgetary oversight experience which made them better qualified than Liu for the position of Assistant Director of ALS and that her race, national origin and gender played no role in the decision-making process. (Pl.'s 56.1 Resp. ¶¶ 43-46.)

When Buron vacated the position of Assistant Director of CLS, he was replaced by a female. When Fortin and Figueroa left their positions as Assistant Director of CLS, they were also both replaced by females in the upgraded position of Director of Community Library Services. (Pl.'s 56.1 Resp. ¶¶ 47-50.)

## IV.    The 2009 Associate Director of Central Library Position

In 2009, the Library posted the position of Associate Director of the Central Library. The Central Library is the flagship in Defendant's library system. The posting set forth the following minimum qualifications:

> MLS from an ALA accredited library school and 6 to 8 years of managerial experience required. Evidence of knowledge of policy and organizational planning. Ability to think creatively as well as critically. Candidate must have demonstrated understanding of the administrative, policy and philosophical issues facing public libraries during a period of significant change in the delivery of customer service. Candidates must be able to participate in the short and long range planning process and guide the resultant activities. In addition to being a skilled communicator, candidates must be able to establish positive cooperative working relationships within all levels of the organization. Evidence of involvement and participation in the profession outside of the Library is essential. Candidates must be expertly familiar with current practices in librarianship, public library service and management. All candidates must be in their current position for at least one year to be considered.

(Def.'s Counter 56.1 ¶ 143.)

Plaintiff, together with Buron and Donna Ciampa applied for the position. Liu was interviewed; Buron was the successful candidate. (Pl.'s 56.1 Resp. ¶¶ 51-57; Def.'s Counter 56.1 ¶ 143.)

At the time of his interview, Buron had supervised 20 library branches since 2007 in his

role as Assistant Director of CLS; this included supervising the 20 branch managers and conducting their performance evaluations. He was also responsible for disciplining all employees in those 20 branches, helping to establish budgets for each branch at the beginning of each fiscal year and then monitoring each of those budgets. As coordinator for young adult services, Buron had been responsible for programs in 62 branch locations. (Pl.'s 56.1 Resp. ¶¶ 58-61.)

In comparison, Liu had never been responsible for managing multiple branch locations, or for hiring or firing employees; in her role as Departmental Assistant she was not responsible for disciplining any other employees. (Pl.'s 56.1 Resp. ¶¶ 62-64.)

The interview committee consisted of four females and one male: Tom Galante, Maureen O'Connor, Angelica Huynh, Lorna Rudder-Kilkenny and Diana Smith; Huynh is of Vietnamese national origin. Plaintiff's national origin and gender did not play any role in O'Connor's decision making process and to her knowledge did not play any role in her fellow panel members decision making process. Rather, Buron's experience served to make him the best qualified candidate for the position. (Pl.'s 56.1 Resp. ¶¶ 54-55, 66-67.)

## V.    The 2013/2014 Talent Development/Training Manager Position

In 2013 the Library posted the position of Talent Development/Training Manager ("TDTM"), specifying the following minimum qualifications:

> Bachelor's degree required. Master's Degree in related area
> preferred. Experience working with and leading public-
> focused/front line staff preferred. Seven years of professional
> management experience required.  Must demonstrate the ability to
> execute and improve Learning & Development processes. Must
> process strategic short/long-term thinking capabilities with a focus
> on providing excellent customer service. Must have the ability to
> conduct and oversee needs assessments with well-developed
> project management skills. Experience providing and coordinating

training preferred. Strong organizational skills with ability to meet
deadlines while maintaining accuracy required.

Plaintiff submitted an application for the position. (Pl.'s 56.1 Resp. ¶¶ 68-70; Def.'s Counter

56.1 ¶ 144.)

Plaintiff was interviewed for the position of TDTM in January 2014 by a hiring panel

consisting of three women (Tracie Hall, Marta Clark and Sharon Cox) and one male of Asian

national origin (Nelson Lu). According to Lu, Plaintiff demonstrated mainly customer service

experience. Throughout her interview, Plaintiff kept referring back to her time as an assistant

professor in China some 20 years prior to the interview. Defendant maintains this experience was

not relevant to the duties and/or responsibilities of the position and that Liu was unable to

articulate a substantive vision for planning, developing, and implementing the Library's talent

development and training strategies. On the other hand, Liu maintains her time as an "assistant

professor in the university for five years directly related like (sic) development and training" and

that she expressed ideas for training, including training sessions to incorporate groups of

individuals with similar performance issues. In responding to Defendant's 56.1 Statement Liu

does not dispute,[2] and therefore admits, that she was "unable to provide any detailed answers to

the interview panel's questions, i.e. Plaintiff would veer away from the topic asked, specifically

the topic of what she would do in order to carry out the specific duties of the position sought."

(Pl.'s 56.1 Resp. ¶¶ 75-77.)

---

[2] The Court notes that this is not a case where a party has failed to respond to a movant's
56.1 statement.  Here, Plaintiff filed a response to Defendant's 56.1 Statement, disputing some
statements, stating that other proffered facts (including the one referenced in the text above and
in other parts of this Memorandum) were "undisputed for purposes of this motion," as well as
adding additional facts she wished to be considered.

Manual Figueroa also applied for the position. His resume documented 13 years of experience as a librarian, with five years experience as a Supervising Branch Librarian and two years of experience as a District Librarian at the New York Public Library. As a District Librarian, Figueroa was responsible for 12 branch locations within the New York Public Library system. In his executive-level roles with the New York Public Library system, Figueroa's responsibilities included directing the professional development and training of the library managers, librarians and staff within the 12 branch libraries he supervised. Additionally, Figueroa had served for five years as the Library's Assistant Director for CLS from January of 2008 until this position became available during which he was responsible for at least twenty (20) community library branches, including (1) directing the professional development of their library managers, librarians and other staff, (2) preparing and conducting the performance reviews of the managers, (3) disciplining branch employees, and (4) supervising their budgets. Liu does not dispute that in his interview Figueroa "appeared to be much better prepared than Plaintiff, and he impressed the panel by specifically citing web-based training modules which he referenced during his interview." She also does not dispute that "Mr. Lu concluded that [she] did not demonstrate that she possessed the managerial and training experience which would have distinguished her from Mr. Figueroa as the better-qualified candidate" and that no comments regarding her race, national origin or gender were made during the post-interview caucus during which the panel discussed the candidate [sic]." (Pl.'s 56.1 Resp. ¶¶ 78-83, 87-88).

Figueroa was hired for the position of TDTM. Plaintiff does not dispute that "[t]he interview panel unanimously concluded that Mr. Figueroa should be hired because he was the best-qualified candidate for the position." She does dispute that the her "race, national origin or

gender played absolutely no role in Mr. Lu, Ms. Cox or Ms. Hall's decision not to recommend Plaintiff for the position." According to Plaintiff, after the interviews were concluded Ms. Hall brought Liu into her office to tell her why she did not get the position. Ms. Hall did not state that it was because she was woman or because she was Chinese. According to Plaintiff, however, Hall told her that she did not get the position because she "is not open," which Liu interpreted to mean not open like Americans and a reference to her national origin. Hall denies having made the statement. (Pl.'s 56.1 Resp. ¶¶ 85-86, 104-06; Def.'s Counter 56.1 ¶ 136.)

## VI.    Pay Disparity

Plaintiff identified three comparators in support of her pay disparity claim during discovery, viz. Fortin, Buron and Figueroa, asserting that in or about 2007 their job title and salaries were upgraded to reflect a CLS Assistant Director position but her's were not although she performed the duties of a CLS Assistant Director. (Pl.'s 56.1 Resp. ¶ 93.)

Assistant Directors for CLS have responsibility for supervising 20 libraries, including overseeing managers and staff, conducting yearly performance evaluations and imposing progressive discipline, as well as, budgeting responsibilities; Liu does not have those responsibilities. (Pl.'s 56.1 Resp. ¶¶ 95-96.)

Plaintiff received the following salary increases: 5.5% in 2007; 3% in 2008; 4% in 2009; 2.5% in 2013; 1.954% in 2014. (Pl.'s 56.1 Resp. ¶¶ 129-133.)

Plaintiff does not dispute that when Tatyana Magazinnik replaced Buron as Assistant Director of CLS, she earned $83,400 compared to Liu's $69,000; the reason for the pay differential "was that the positions at issue were vastly different with different responsibilities." Magazinnik "was going to be supervising 20 library managers in 20 community libraries [and]

would have responsibility for performance reviews, discipline and budgeting."  (Pl.'s 56.1 Resp. ¶¶ 97-98.)

Plaintiff contends that in 2005 her job duties changed to incorporate part of the duties previously handled by Thomas Alford, the Deputy Director of Customer Services, including the customer service aspects of his job and collection duties, a fact disputed by Defendant. In light of this change, she alleges that she complained and asked for a re-evaluation of her job title and duties. No action was taken. (Def.'s Counter 56.1 ¶¶ 155-160.)

## VII.  Other Matters

Plaintiff testified that a customer complained about an employee at the Jackson Heights branch named Edith allegedly calling a customer a "chink." Liu was not present when the remark was allegedly made. Liu forwarded the complaint to Magazinnik, who had oversight for the Jackson Heights branch. Magazinnik began an investigation into the complaint and apprised the Community Library Manager at the Jackson Heights branch, Weiqing Dai, a person of Chinese national origin, of the complaint. (Pl.'s 56.1 Resp. ¶¶ 107-111.)

In a performance review of Plaintiff for the period July 1, 2003 through June 30, 2004, Plaintiff's supervisor, Bernadine Byer, stated that Plaintiff "had to watch her tone and watch the accuracy of her communication." However, Plaintiff testified that "her allegation regarding tone and accuracy of communications do not reflect anything else other than what Ms. Byer put in the performance review."  Byer left the employment of the Library in November 2004. (Pl.'s 56.1 Resp. ¶¶ 112-115.)

According to Plaintiff, Paula Goings, the former Associate Director of Community Library Services, mocked Plaintiff's accent, told her  that her accent was too hard to understand

and that she did not speak standard English. Plaintiff did not complain to anyone in Human Resources after Goings allegedly made the comments. Goings retired in October 2010. (Pl.'s 56.1 Resp. ¶¶ 116-118.) Plaintiff also testified that a former library employee Valerie Kilmartin allegedly accused Chinese individuals of being spies. Kilmartin retired from the Library's employ in July 2004. (Pl.'s 56.1 Resp. ¶¶ 123-124.) Plaintiff admits that no one at the Queens Library ever directed a racially derogatory comment to her or made a comment to her about her gender. (Pl.'s 56.1 Resp. ¶¶ 127-128.)

## DISCUSSION

### I.     Standard: Motion for Summary Judgment

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     The Parties' Contentions

In support of its motion, Defendant argues that Liu's claims regarding the 2007 and 2009

positions are barred by the statute of limitations. Further, her claims regarding all three positions fail on the merits because she failed to set forth a prima facie case as she was not qualified for the TDTM position and because the hiring decision for all three positions did not occur under circumstances which would give rise to an inference of discriminatory intent. It argues that it had legitimate non-discriminatory reasons for its decisions and there is no evidence of pretext. As to Plaintiff's EPA claims, Defendants maintain that they fail on the merits and the claims are time-barred.

Plaintiff does not contest that the 2007/2009 claims are time-barred. She asserts that she has put forth sufficient evidence of a discriminatory motivation for the Library's failure to promote her to the position of TDTM. She further argues that her EPA claim survives as her duties of resolving customer enquiries and complaints and investigating and responding to requests from the Library's collection service were previously the responsibility of Thomas Alford, the former Director of Customer Services.

By way of format, the Court will first address Plaintiff's Title VII, NYSHRL AND NYCHRL claims with respect to the position of TDTM. Like the parties, the Court will jointly discuss the claims for race/national origin discrimination and sex discrimination. Next, Plaintiff's EPA and state law equal pay claims will be addressed.

## III.    Title VII, NYSHRL and NYCHRL Claims

### A.    Applicable Law

Title VII prohibits an employer from discriminating against an employee on the basis of race, color, religion, sex, or national origin.  Title VII and NYSHRL discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corporation v.*

*Green*, 411 U.S. 792 (1973). *See Walsh v. New York City Housing Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Under *McDonnell Douglas* and its progeny, a plaintiff must first establish a prima facie case of discrimination by showing that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [the adverse act]." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks and citation omitted). Should the employer satisfy its burden, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143. It is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, "the fact-finder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 147 (internal quotation marks omitted). In other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis and alteration omitted).

A plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted); *see also Taylor v. Family Residences and Essential Enters., Inc.*, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) ("[A plaintiff] may show pretext

by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (citations and internal quotation marks omitted)). However, "the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Grant v. Roche Diagnostics Corp.*, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011) (quoting *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008)).

Where a plaintiff offers evidence of pretext, a "case-by-case approach" is appropriate whereby a court examines "the entire record to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted). Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves*, 530 U.S. at 148–49. Even if "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and

uncontroverted independent evidence that no discrimination had occurred." *Id*. at 148.

For purposes of this motion the Court will assume that Liu has established a prima facie case. *See Sattar v. Johnson*, 129 F. Supp.3d 123, 138 (S.D.N.Y. 2015) ("Despite the elaborate framework set up in *McDonnell Douglas*, Second Circuit case law makes clear that the court may simply assume that the plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action.") (citing cases). As discussed below, the Court concludes that Liu cannot show pretext and no reasonable jury could conclude that the failure to promote Plaintiff to the position of TDTM was discriminatory.

### B.     The Evidence Does Not Support a Finding of Discriminatory Animus

Defendant has offered a legitimate, non-discriminatory reason for failing to select Plaintiff for the TDTM position - specifically that she was not as well qualified for the position, nor did she perform as well as the selected individual during her interview. Indeed, this position is well supported by the following facts which are conceded by Plaintiff:

> (1) Plaintiff was unable to provide detailed answers to the interview panel's questions, veering away from the topic asked, to wit, what she would do in order to carry out the duties of the position. (Pl.'s 56.1 Resp. at ¶ 85.)

> (2) In his executive level roles with the New York Public Library, Figueroa's responsibilities included directing the professional development and training of the library managers, librarians and staff within the 12 branch locations he supervised.  (Pl.'s 56.1 Resp. at ¶ 77.)

> (3) As Assistant Director for CLS, Mr. Figueroa was responsible for twenty community library branches including directing the professional development and disciplining all staff at these branches, supervising their budgets, and conducting the performance reviews of their managers. (Pl.'s 56.1 Resp. at ¶ 82.)

> (4) Figueroa appeared to be much better prepared than Plaintiff during his interview and

impressed the panel by specifically citing web-based training modules which he referenced during his interview. (Pl.'s 56.1 Resp. at ¶ 83.)

(5) One member of the interview panel concluded that Plaintiff did not demonstrate that she possessed the managerial and training experience that would have distinguished her from Figueroa as the better qualified candidate. (Pl.'s 56.1 Resp. at ¶ 87.)

(6) "The interview panel unanimously concluded that Mr. Figueroa should be hired because he was the best-qualified candidate for the position of [TDTM]." (Pl.'s 56.1 Resp. at ¶ 85.)

Therefore, the Court turns to the question of whether Liu has identified evidence that would allow a reasonable jury to find that the failure to select her was discriminatory.

Plaintiff relies on the following to support her claim that her protected characteristics were a motivating factor in her nonselection: "(1) the repeated nature of the denials despite plaintiff being qualified for each of the positions; (2) that the positions were given to Plaintiff's male counterparts who are not of Chinese national origin; (3) the affidavits submitted as part of Defendant's instant motion by those involved are self-serving devices to absolve them of culpability in this matter; (4) the circumstances surrounding Ms. Hall's remark to Plaintiff as to the reason Plaintiff was not selected for the 2013 [TDTM] position; and (5) the continued disregard of Plaintiff's work experience in China . . . ." (Pl.'s Mem. in Opp. at 16.) The Court will address each of these items ad seriatim.

In view of the undisputed facts, that Liu did not receive the 2007 and 2009 positions does not support her claim of discrimination. She concedes that she had never been responsible for managing multiple branch locations, supervising managerial employees, hiring, firing, or disciplining employees, and did not have the same extensive budgetary experience as the individuals selected. She also concedes that the hiring panel concluded that Buron, Fortin and

Figueroa had each established that they possessed significant system-wide managerial and budgetary oversight experience which made them better qualified than Liu. Plaintiff simply has not put forth evidence that she "was objectively so much better qualified than the person[s] promoted over [her] that the employer's justification for the decision must be pretextual." *Witkowich v. Gonzales*, 541 F. Supp.2d 572, 582 (S.D.N.Y. 2008) (citation omitted).

Nor does the fact that the positions went to males who were not of Chinese origin support an inference of discrimination in view of the record before the Court. Absent is any evidence of whether there were other applicants for the 2007 positions and what their gender and racial/ethic background were. Thus that the position went to males who are not of Chinese origin does not support an inference of discrimination. *Cf. Schupach v. Shinseki*, 905 F. Supp.2d 422 (E.D.N.Y. 2012) (hiring statistics were insufficient to overcome motion for summary judgment where statistics regarding the pool of applicants that were considered was not provided); *Sattar v. Johnson*, 129 F. Supp.3d 123, 140 (S.D.N.Y. 2015) (Without information as to the characteristics of the applicant pool, "it is impossible to determine if the selections for particular positions deviate from the rate of selection that would be expected if the personal characteristics of the applicants were not influencing the decision-makers' selection.").[3] Similarly the information provided as to the applicants for the 2009 position (plaintiff, Buron, and Donna Campbell) is insufficient to support that Plaintiff's race/national origin or sex played a role in that decision, especially when juxtaposed to the undisputed fact that, unlike Buron, Plaintiff had never been

---

[3] The Court notes parenthetically that is undisputed that the successors to Fortin, Buron and Figueroa for the position of Assistant Director of CLS were all females. (Pl.'s 56.1 Resp. ¶¶ 47-50.)

responsible for managing multiple branch locations or for hiring or firing employees.

Plaintiff's alleges, in support of her claim of discrimination, that the affidavits submitted in support of the Library's motion are "self-serving." However, discovery in this case is closed and there is no claim that Plaintiff was precluded from deposing the declarants. More importantly, such a bald allegation in insufficient to defeat a motion for summary judgment. Rather, as discussed earlier, it is Plaintiff's burden, in a case such as this, to put forth evidence that permits an inference that the adverse action was motivated in part by discrimination.

Next to be addressed is the alleged statement of Ms. Hall, a member of the interview panel for the TDTM position, that Plaintiff did not receive that position because she was not "open." First, it bears noting that Plaintiff does not contend that this statement supports her sex discrimination claim; rather she references it only as to her race/national origin claim. However, there is nothing, other than Liu's subjective interpretation, to support that this comment was directed at her race/national origin. *See Haynes v. Capital One Bank*, 2015 WL 2213726, *2 (E.D.N.Y. May 8, 2015) (ambiguous remark insufficient to support inference of discrimination); *Shephard v. BCBG Max Azria Group, Inc.*, 2012 WL 4832883 (S.D.N.Y. Oct. 11, 2012) (no inference of discrimination where remark did not clearly refer to race; plaintiff's belief that remark was motivated by discrimination is not sufficient); *cf. Saunders v. McDonald Invs. Inc.,* 110 Fed. App'x 150, 152 (2d Cir.2004) (four statements by supervisor were ambiguous and therefore did not support discrimination). Moreover, "[s]tatements do not demonstrate discriminatory animus merely because they reflect poorly on the plaintiff." *Lynch v. Pathmark Supermarkets*, 987 F. supp. 236, 243 (S.D.N.Y. 1997). When juxtaposed to Plaintiff's factual concessions, including that the "the interview panel unanimously concluded that Figueroa should

be hired because he was the best-qualified candidate for the position," this remark does not support an inference of discriminatory intent.

Lastly, Plaintiff contends that discriminatory motivation is demonstrated by the continued disregard of her work experience in China. "[A]n employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility" of the employer's stated reason for its employment decision. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (citing cases). However, it is appropriate in the current context to "afford employers a great deal of discretion in assessing the credentials and qualifications of applicants and in determining the criteria for positions." *Milano v. Astrue*, 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008) (citing cases), *aff'd*, 382 Fed. App'x 4 (2d Cir. 2010). For a discrepancy in qualifications to serve as a basis to defeat a motion for summary judgment, the plaintiff's "credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103; *accord Cintron v. Orange Cnty. Cmty. Coll.*, 2013 WL 1812196, at *6 (S.D.N.Y. Apr. 29, 2013). In other words, "[a] plaintiff may defeat summary judgment by showing that [s]he was objectively so much better qualified than the person promoted over [her] that the employer's justification for the decision must be pretextual." *Witkowich,* 541 F. Supp.2d at 582 (citation omitted). Viewed objectively, Plaintiff's work experience in China is not superior to Figueroa's prior experience. First, Figueroa's experience was more relevant as his administrative and training experience was garnered in a library setting as opposed to an academic setting. Moreover, Figueroa had experience in training and management that was more recent than Plaintiff's work experience

duties in China. Thus, that the Library may have discounted that experience does not demonstrate a discriminatory motive especially where, as here, Plaintiff admits that during his interview the successful candidate "appeared to be much better prepared than [her] and impressed the panel by specifically citing web-based training modules" and that the "interview panel unanimously concluded Figueroa should be hired because he was the best-qualified candidate for the position of TDTM." (Pl.'s 56.1 Resp. ¶83, 85.)

Viewing the record as a whole, it is insufficient to permit a trier of fact to infer that Defendant's failure to promote Liu to the TDTM position was more likely than not motivated in part by discrimination.[4] Summary judgment is granted in favor of defendant on Plaintiff's Title VII, NYSHRL and NYCHRL claims.[5]

## IV.     The EPA  and NYLL Claims

### A.     Applicable Law

 "The Equal Pay Act . . . prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work . . .' "

---

[4] Although not referenced by Plaintiff in her memorandum, the Court notes that the alleged statements by a Jackson Heights branch employee referring to a customer as a "chink" and by Paula Goings referring to Liu's accent provides no support to Liu's claim. The undisputed facts demonstrate that the Library timely investigated the customer's claim and  plaintiff did not report Goings' statement to anyone. Also there is no evidence that Goings played any role in determining who was selected for any of the referenced positions and in fact she was no longer employed by the Library at the time of the posting of the TDTM position. (Pl.'s 56.1 Resp. ¶¶ 107-111,116-122.)

[5] Although  a NYCHRL claim is subject to a different standard, i.e., a plaintiff must show only differential treatment of any degree based on a discriminatory motive and a materially adverse employment action is not required, *see Gorokhovsky v. New York City Housing Auth.*, 552 Fed. App'x 100, 102 (2d Cir. 2014), that differing standard has no impact on the present case.

*Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting 29 U.S.C. § 206(d)(1)). Its

purpose is to "legislate out of existence a long-held, but outmoded societal view that a man

should be paid more than a woman for the same work." *Id*. Claims under the EPA are analyzed

pursuant to a burden-shifting framework. *See Ryduchowski v. Port. Auth. of N.Y. & N.J.*, 203

F.3d 135, 142 (2d cir. 2000). Under that framework, a plaintiff must initially demonstrate "that

[1] the employer pays different wages to employees of the opposite sex; [2] the employees

perform equal work on jobs requiring equal skill, effort, and responsibility; and [3] the jobs are

performed under similar working conditions." *E.E.O.C. v. Port. Auth. of N.Y. & N.J.*, 768 F.3d

247, 254-55 (2d Cir. 2014) (internal quotation marks omitted). [U]nlike Title VII, an EPA

plaintiff is not required to establish her employer's discriminatory intent. *Id*. After the prima

facie case is established, the burden shifts to defendant "to show, by a preponderance of the

evidence, that the pay differential is attributable to '(i) a seniority system; (ii) a merit system; (iii)

a system which measures earnings by quantity or quality of production; or (iv) a differential

based on any other factor other than sex.' " *Flaherty v. Massapequa Pub. Sch.*, 752 F. Supp.2d

286, 299 (E.D.N.Y. 2010) (quoting 29 U.S.C. § 206(d)(1)). The burden of establishing such an

affirmative defense is heavy." *Jamilik v. Yale Univ.*, 362 Fed. App'x 148, 150 (2d Cir. 2009).

"Further, to successfully establish the 'factor other than sex' defense, an employer must also

demonstrate that it had a legitimate business reason for implementing the gender-neutral factor

that brought about the wage differential." *Belfi*, 191 F.3d at 136. Lastly, a plaintiff may "counter

the employer's affirmative defense by producing evidence that the reasons the defendant seeks to

advance are actually a pretext for sex discrimination." *Id*. "The appropriate inquiry to determine

if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in

light of the employer's stated purpose as well as its other practices." *Id*. (citation omitted). Equal pay claims brought under the New York Labor Law are analyzed under this same standard. *Talware v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28, 31 n.2 (2d Cir. 2015).

**B.      Plaintiff has not Proffered Sufficient Evidence to Support These Claims**

Initially, the Court notes that Plaintiff appears to have abandoned any claim that the relevant comparators are Buron, Fortin and Figueroa as her memorandum refers solely to Thomas Alford, the Defendant's former Deputy Director of Customer Services, as a comparator. (Pl'.s Mem. in Opp. at 18-20.) Accordingly, the Court shall confine its analysis to Alford.

Absent from the record before this Court is any information as to Alford's salary. Thus Liu has not satisfied the requirement that she submit evidence that the Library paid different wages to an employee of the opposite sex.

Nor has she submitted evidence to support that she and Alford "perform[ed] equal work on jobs requiring equal skill, effort, and responsibility." For this aspect of her EPA burden, Plaintiff merely attests that (1) beginning in 2005 her job duties were changed "to incorporate part of the duties previously handled by Thomas Alford, Defendant's former Director of Customer Service, including the customer service aspects of Mr. Alford's job and the Unique collection duties;" (2) she continues to undertake the responsibilities performed originally by Alford; and (3) in 2012 Buron assumed certain aspects of Mr. Alford's job duties. (Pl.'s 56.1 Resp. ¶ 156, 163, 164; *see* Liu Declar. ¶ 13 ("I was tasked with the customer service aspects of Mr. Alford's role and handling the requests [from] Unique collection services following his retirement.")  At best, this supports that she took on *some* of Alford's duties. However, without a full description of what Alford's actual job requirements and performance were, there can be no

comparison as to whether her actual duties and Alford's required "equal skill, effort, and responsibility." *See Moccio v. Cornell Univ.*, 889 F. Supp.2d 539, 570-71 (S.D.N.Y. 2012). In other words, the proffered evidence does not permit an inference that the two positions are substantially equal.

Defendant's motion for summary judgment on Plaintiff's EPA and NYLL claims is granted.

## CONCLUSION

In accordance with the foregoing, Defendant's motion for summary judgment is granted. The Clerk of Court shall enter judgment accordingly and close this case.

Dated: Central Islip, New York
        September 20, 2017                          __/s__ Denis R. Hurley_____
                                                    Denis R. Hurley
                                                    United States District Judge